Stephen F. Smith
steve@smithmcowenlaw.com
Idaho Bar 2165
Smith & McOwen, Attorneys at Law
102 Superior Street
Sandpoint, ID 83864
Phone: (208) 263-3115

Mathew D. Staver (Fla. 0701092)
court@lc.org
Horatio G. Mihet (Fla. 026581)
hmihet@lc.org
Daniel J. Schmid (VA 84415)
dschmid@lc.org
Richard L. Mast (VA 80660)
rmast@lc.org
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Facsimile: (407) 875-0770
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MAJOR DAVID T. WORLEY,<br><br>    Plaintiff,<br><br>v.<br><br>BRAD LITTLE, in his official capacity as Governor of the State of Idaho and Commander-in-Chief of the Idaho National Guard; MAJOR GENERAL TIMOTHY J. DONNELLAN, in his official capacity as Adjutant General of the Idaho National Guard; BRIGADIER GENERAL JAMES C. PACKWOOD, in his official capacity as Assistant Adjutant General of the Idaho Army National Guard,<br><br>    Defendants. | Case No.: <u>1:25-cv-25-DKG</u><br><br><br>MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION. |

## URGENCIES JUSTIFYING TEMPORARY RESTRAINING ORDER

Plaintiff, Major David T. Worley, is an Infantry Officer in the Idaho Army National Guard, who has been unlawfully, unconstitutionally, and unconscionably subjected to investigation, discrimination, retaliation, and punishment for the simple exercise of his First Amendment rights to engage in speech on matters of public concern—outside the confines of his duties with the Idaho Army National Guard—and to exercise his sincerely held religious beliefs without fear of discriminatory reprisal from his chain of command. (Verified Complaint for Temporary Restraining Order, Preliminary and Permanent Injunctive Relief, Declaratory Relief, and Damages, "V. Compl.," ¶1.) Major Worley engaged in private speech—outside the confines and strictures of his military duties—discussing issues and topics relevant to the political discourse taking place in his community. (V. Compl., ¶2.) All of Major Worley's religious exercise and expression took place **before Major Worley even assumed his role in the Idaho Army National Guard**. (*Id.*) Major Worley's constitutionally protected religious expression occurred during his campaigns for Mayor of Pocatello and Idaho State Senate, and while acting as private citizen after those campaigns concluded. (*Id.*) He espoused his religious convictions and expressed his religious and moral opposition to certain issues, such as the so-called "Drag Queen Story Hours" and the obscene materials being provided to minors in public libraries, taking place in his community. (*Id.*)

In July 2023, Major Worley took command of an Idaho Army National Guard Recruiting and Retention unit. A Sergeant First Class under Major Worley's command (hereinafter "Complaining Guardsman") performed a Google search of the Major after he had been promoted to command the unit. (V. Compl., ¶3.) As a result of that search, the Complaining Guardsman, who was ideologically opposed to Major Worley's religious beliefs, views, and expression, filed a complaint with the Equal Opportunity Employment Commission (hereinafter "EO Complaint"),

alleging Major Worley created a hostile work environment against the Complaining Guardsman for his alleged sexual orientation. (*Id*.) The sole factual predicates of the EO Complaint against Major Worley were the press reports of Major Worley's opposition to Drag Queen Story Hour and the pornography, obscenity, and other inappropriate materials for minors in the public library, and Major Worley's speech on religious and moral issues that he gave as part of his political campaigns when he ran for elected office. (*Id*.) Major Worley had met Complaining Guardsman on only two occasions, first at the initial meeting of his new command, and then a couple weeks later. Major Worley had no other interactions with Complaining Guardsman. (V. Compl., ¶4.) As a result of the EO Complaint, Major Worley was unceremoniously haled into his command's office—**just a few short days after assuming his new command**—and told that he must resign or face significant and life-altering disciplinary proceedings. (V. Compl., ¶6.) Major Worley initially resigned, but rescinded that resignation upon the advice of counsel and the swift realization that capitulation in the face of blatant injustice would be a stain on his honor and a betrayal of his faith. (*Id.*)

As a result of the EO Complaint, Major Worley was subjected to an administrative proceeding (hereinafter the "AR 15-6") in which he was investigated for his alleged offenses and was immediately suspended pending the process of that investigation and its conclusion. (V. Compl., ¶7.) As a result of the investigation, the Investigating Officer recommended to Defendants that Major Worley be **permanently removed** from command**.** (V. Compl., ¶7.) **The sole basis for this recommended removal of Major Worley was that he had engaged in religious expression and speech the Investigating Officer found offensive**. (*Id*.) To make matters worse, as part of his report to Defendants, the Investigating Officer recommended that Defendants adopt a policy (hereinafter the "No Christians in Command" Policy) to ferret out "extremists" in the military by looking at the social media profiles of potential command candidates to make sure there is no

"concerning information" about them, to determine how those candidates portray themselves publicly, to make sure the candidate would be supportive of a "diverse" groups of subordinates, and to get "the full picture of the candidate's beliefs, views, and public expression. (V. Compl., ¶8.) The only "concerning" information about Major Worley was, of course, his religious views, beliefs, expression, and speech. (V. Compl., ¶9.)

After being removed from command while the investigation was undertaken and the administrative disciplinary proceedings concluded, Major Worley has been deprived of a duty position, assignments, and responsibilities. (V. Compl., ¶10.) He was not allowed to drill with any unit, ostracized from the military, and his career has been rendered stagnant since July of 2023. (*Id*.) This has caused irreparable harm to his reputation and career, almost guaranteeing that he will not be selected for future positions of responsibility and has little chance of promotion. (*Id*.) Major Worley has served for over 22 years in the Army National Guard and has over 13 years of active service. (*Id*.) The derailment of his career has almost rendered it impossible to receive the active-duty retirement he has been working towards for over two decades. (*Id*.) This irreparable injury is solely the result of by being punished for the exercise and expression of his sincere religious convictions. And, the allegedly offending religious expression and exercise all occurred prior to Major Worley's position as commanding officer of the Recruiting and Retention Unit. (V. Compl., ¶10.) On December 12, Major Worley was informed that he was to be permanently separated from active duty with the Idaho National Guard, effective within thirty days of the finalization of the paperwork. (V. Compl., ¶11.) **Absent a TRO and preliminary injunction, Major Worley will be unceremoniously, unconstitutionally, and unlawfully removed of his position permanently and separated from the active-duty force of the Idaho Army National Guard and potentially**

**separated from the military entirely and permanently for the mere exercise of his constitutionally protected rights to religion and speech**. (V. Compl., ¶14.)

## ARGUMENT

The purpose of a TRO is to preserve the status quo between the parties before the Court can hear the matter on the merits, *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009), and the relevant status quo is the "*status quo ante litem*" or "the last uncontested status which preceded the pending controversy." *Regents of the Univ. of Cal. v. Am. Broad. Co., Inc.*, 747 F.2d 511, 514 (9th Cir. 1984). To obtain a TRO and preliminary injunction, Plaintiff must show he is likely to succeed on the merits, will suffer irreparable harm absent injunctive relief, the balance of the equities tips in his favor, and the public interest favors injunctive relief. *Network Auto, Inc. v. Adv. Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011). The elements for a TRO and preliminary injunction are "substantially identical." *Stuhlbarg Int'l Sales Co., Inc. v. John D. Bursh & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Major Worley satisfies each element both factually and legally. (Major Worley hereby incorporates by reference the allegations of his sworn Verified Complaint, filed simultaneously herewith.)

**I.    Major Worley Is Likely To Succeed On The Merits Of His Claims Under the First And Fourteenth Amendments, And The Free Exercise Of Religion Protect Act.**

**A.    Major Worley is likely to succeed on the merits of his FERPA claims.**

The Idaho Free Exercise of Religion Protection Act ("FERPA"), provides that "government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability." Idaho Code §73.402(2). If further imposes a significant burden on Defendants to demonstrate that the No Christians in Command Policy (V. Compl., ¶¶93-106) satisfies strict scrutiny, which is "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 US. 507, 534 (1997). Indeed, "[t]hat standard is not watered down; it really

means what it says," *Tandon v. Newsom*, 593 U.S. 61, 65 (2021), which is rarely passed. *See Burson v. Freeman*, 504 U.S. 191, 200 (1992) ("[W]e readily acknowledge that a law rarely survives such scrutiny . . . ."). Because Defendants cannot show that a categorical exclusion of religious adherents from command in the Idaho Army National Guard satisfies this test, Major Worley is likely to succeed on the merits of his FERPA claims.

FERPA largely mirrors the federal Religious Freedom Restoration Act, 42 U.S.C. §2000bb-1 ("RFRA"), *see Does v. Wasden*, 982 F.3d 784, 794 (9th Cir. 2020), and federal interpretations of RFRA are used in construing FERPA. *See State v. Cordingly*, 302 P.3d 730, 733 n.2 (Ida. Ct. App. 2013); (*State v. White*, 271 P.2d 1217, 1220 n.2 (Ida. Ct. App. 2011). In fact, the only substantive distinction between RFRA and FERPA makes FERPA even more protective of religious exercise than its demanding federal counterpart. *E.g.*, *Wasden*, 982 F.3d at 794 ("FERPA's definition of substantial burden is much broader than RFRA's"); *Cordingly*, 302 P.3d at 733 n.2 ("Although the Idaho legislature stated it was adopting the compelling interest test of the RFRA, it departed from the RFRA in a key manner by adopting a much broader definition of 'substantially burdens.'").

"RFRA secures for [Major Worley] (and any service members) a claim against the military for violation of Free Exercise. . . . No exemption, whether express or implied, insulates a military infringement of Free Exercise from review in the district court." *Colonel Fin. Mgmt. Officer v. Austin*, 622 F. Supp. 3d 1187, 1200 (M.D. Fla. 2022). Indeed, Idaho representatives

> by enacting [FERPA] have established — for the narrow category of Free Exercise
> — an action and a remedy in the district court, have specified and placed the burden
> of proof on the military, and have allowed for an "appropriate remedy" to ensure a
> service member's Free Exercise. That conclusion is not fairly contestable, and the
> military must acquiesce to the command of Congress and the President in that
> respect. A service member can sue in a district court to enjoin a violation of RFRA.

*Id.* at 1202. Major Worley is likely to succeed on the merits of his FERPA claims.

**1. Defendants' No Christians in Command Policy substantially burdens Major Worley's religious exercise.**

By adopting a much broader definition of "substantially burdens," Idaho selected "the broadest of [the] possible tests." *Wasden*, 982 F.3d at 794. "FERPA's substantial burden prong is governed by the religious motivation test . . . requiring only 'that the government prevented the claimant from engaging in conduct both important to them and motivated by sincere religious belief.'" *Id.* A specific policy adopted by the Idaho Army National Guard prohibiting the exercise of religious beliefs and expression by those in command (or even candidates for command) is plainly a substantial burden on Major Worley. Defendants' No Christians in Command Policy forces Major Worley "to choose between betraying a sincere religious conviction and suffering court martial or separation from the military, and likely, visiting adverse consequences on [his] family." *Colonel Fin. Mgmt Officer*, 622 F. Supp. 3d at 1210. Indeed, Defendant's No Christians in Command Policy "demands that [Major Worley] engage in conduct that seriously violates [his] religious beliefs." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720 (2014); *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 350 (5th Cir. 2022) (military policy imposes substantial burden when it requires servicemember to act "at odds with their most profound convictions).

Here, there is little question that Major Worley's sincere religious convictions are burdened by the No Christians in Command Policy. Major Worley has sincerely held religious beliefs that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and that he is to follow its teachings. (V. Compl., ¶45.) Major Worley has sincerely held religious beliefs, compelled by Scripture, that "to him that knoweth to do good, and doeth it not, to him it is sin," that he is "to take no part in the unfruitful works of darkness," and that silence in the face of evil is evil itself. (V. Compl., ¶¶43-51.) Defendant's No Christians in Command Policy requires Major Worley to remain silent as to his sincere religious convictions or face—as is evident from the investigation

into Major Worley here—significant and life altering discipline from Defendants. (*See* V. Compl., ¶¶83-92.) That burden is substantial on Major Worley because it requires him to risk the eternal condemnation of his soul. (V. Compl., ¶51.) Defendants' "policy requires [Major Worley] to 'engage in conduct that seriously violates his beliefs [or] face serious disciplinary action. Because the policy puts [Major Worley] to this choice, it substantially burdens his religious exercise." *Holt v. Hobbs*, 574 U.S. 352, 361 (2015) (citing *Hobby Lobby*, 573 U.S. at 720).

> **2.    Defendants' cannot satisfy their burden to demonstrate that the No Christians in Command Policy survives strict scrutiny.**

> **a.    Defendants bear the burden to satisfy strict scrutiny.**

"As the Government bears the burden of proof on the ultimate question of [the No Christians in Command Policy's] constitutionality, [Plaintiff] must be deemed likely to prevail unless the Government" satisfies strict scrutiny. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Indeed, "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). FERPA "squarely" places the burden on the government to demonstrate the compelling interest achieved through the least restrictive means. *Id.* at 429. Defendants fail that test.

> **b.    Defendants' must discharge their burden "to the person" of Major Worley and cannot rely on formulaic generalizations.**

Defendants are required to demonstrate a compelling government interest and the least restrictive means as it relates directly to Major Worley. Defendants "must discharge both of RFRA's burdens through application of the challenged law to the person—the particular claimant whose sincere exercise of religion is being substantially burdened." *Gonzales*, 546 U.S. at 430-31. "RFRA's focus on the application of the burden to the person demands more than dismissive, encompassing, and inflexible generalizations about the government's interest and about the

absence of a less restrictive alternatives." *Colonel Fin. Mgmt. Officer*, 622 F. Supp. 3d at 1211 (citing *Davilla v. Gladden*, 777 F.3d 1198, 1206 (11th Cir. 2015)).  This inquiry requires the Court to "look beyond broadly formulated interests and to scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Hobby Lobby*, 573 U.S. at 727-28. FERPA's inquiry is "more focused" and "requires scrutiny of the marginal interest in enforcing the challenged government action in that particular context." *Holt*, 574 U.S. at 363.

**b.    Defendants' No Christians in Command Policy is not supported by a compelling interest.**

Where, as here, First Amendment rights are at issue, "the government must shoulder a correspondingly heavier burden and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 585 U.S. 878, 907 (2018). Here, because Defendants' No Christians in Command Policy plainly implicates Major Worley's (and all religious adherents') First Amendment rights, Defendants "must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994); *see also Edenfield v. Fane*, 507 U.S. 761, 770 (1993). This is so because "[d]eference to [the government] cannot limit judicial inquiry when First Amendment rights are at stake." *Landmark Commc'ns, Inc. v. Maine*, 435 U.S. 829, 843 (1978). The government has no interest whatsoever, much less a compelling one, in excluding all religious adherents from command positions. Indeed, the compelling interest is in protecting constitutional rights to religious exercise, *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014), not in excluding religion from the military sphere. *See Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023.)

8

Defendants support their No Christians in Command Policy by relying solely on Defendants' own "mere say-so" that such a policy is necessary. (V. Compl., ¶¶95-96.) Specifically, Defendants suggest that the No Christian in Command Policy is necessary because of the "very public nature of leadership," the need for "trust and confidence with Soldiers and the public," and the "trust and professionalism expected in the Military." (V. Compl., ¶¶95-96.) And, because of those overgeneralized assertions of need, Defendants instituted a policy to ferret out "concerning ideologies" and religious misbelievers from command candidates. (V. Compl., ¶97-98.) Moreover, to ensure that those individuals with Christian and religious views do not assume command, Defendants instituted a policy to "scrutinize" religious beliefs, social media posts, and public information about command candidates to ensure that those persons who can "serve with persons of diverse backgrounds" are permitted to assume command positions (V. Compl., ¶99.) If the No Christians in Command investigatory gestapo stumbles upon such concerning ideologies (read: religious expression), Defendants' No Christians in Command Policy not only ensures no command is assumed, but that such individuals would be reported to the Department of Defense for investigation for extremist activity. (V. Compl., ¶¶98-99.) Defendants' interest in ensuring professional commanders cannot serve as a justification for excluding religious adherents. *Colonel Fin. Mgmt. Officer*, 622 F. Supp. 3d at 1287. RFRA allows Defendants to burden Major Worley's "exercise of [his] faith only as a last resort." *Doster v. Kendall*, 48 F.3d 608, 613 (6th Cir. 2022). "A de facto policy to impose that burden upon [servicemembers] in gross, regardless of their individual circumstances, would seem rather plainly to violate [RFRA's] restriction." *Id.* "Yet that would be the effect of [Defendants'] alleged policy." *Id.*

Simply put, Defendants have no compelling interest in instituting a policy that hunts down those with religious beliefs, ensures they come no where near command positions, and removes

those commanders who assumed command (such as Major Worley here) prior to Defendants' unconstitutional and unconscionable investigatory regime and policy began. The First Amendment knows no such "First Amendment Free Zone," *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987), and that includes the military. *See Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) ("military life do[es] not, of course, render entirely nugatory in the military context the guarantees of the First Amendment.").

**B.      Major Worley is likely to succeed on the merits of his First Amendment free exercise claims.**

"[G]overnment regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 596 U.S. 61, 62 (2021) (emphasis original). In fact, "the regulations cannot be viewed as neutral because they single out [religion] for especially harsh treatment." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17 (2020). "When a state so obviously targets religion for differential treatment, our job becomes much clearer." *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 717 (Gorsuch, J.) (emphasis added). Here, Defendants' No Christians in Command Policy plainly singles out religious command candidates for disparate treatment by instating a policy to wholly prohibit their assumption of command roles for "concerning ideologies. (V. Compl., ¶¶93-106.)

For the same reason that Major Worley is likely to succeed on his FERPA claim, he is likely to succeed on the merits of his First Amendment claim. *Air Force Officer v. Austin*, 588 F. Supp. 3d 1338, 1355 (M.D. Ga. 2022); *Doster v. Kendall*, 596 F. Supp. 3d 995, 1019 (S.D. Ohio 2022).

**C.      Major Worley is likely to succeed on the merits of his First Amendment retaliation claims.**

Defendants' actions toward Major Worley represent a textbook case of unconstitutional retaliation. "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). For this reason, "the state may not abuse its position as employer to stifle the First Amendment rights its employees would otherwise enjoy as citizens to comment on matters of public interest." *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009) (cleaned up). And, as is true with constitutional rights in general, the military is likewise subject to First Amendment retaliation claims when punishing servicemembers for the exercise of their constitutional rights. *Wright v. United States Army*, 307 F. Supp. 2d 1065, 1073 (D. Ariz. 2004).

The Ninth Circuit "has developed a series of five sequential steps to analyze First Amendment retaliation claims brought by government employees." *Hernandez v. City of Phoenix*, 43 F.4th 966, 976 (9th Cir. 2022) (citing *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968), and *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977)). The test asks "(1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech." *Hernandez*, 43 F.4th at 976 (quoting *Eng*, 552 F.3d at 1070). The plaintiff bears the burden of proof on steps one through three, which comprise "a prima facie First Amendment retaliation claim." *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 776 (9th Cir. 2022), whereas the defendants bear the burden of proof on steps four and five, *see id*. at 776–77, 777 n.2. Each step is satisfied here, and Defendants cannot

meet their burden of showing that Major Worley's protected speech interfered with military discipline or effectiveness in any meaningful way.

 1.  **Major Worley engaged in constitutionally protected speech as a private citizen on matters of public concern.**

Major Worley's speech was protected under the First Amendment because he spoke as a private citizen and addressed a matter of legitimate public concern. "Speech involves a matter of public concern when it can fairly be considered to relate to any matter of political, social, or other concern to the community." *Eng*, 552 F.3d at 1070 (quoting *Johnson v. Multnomah Cty.,* 48 F.3d 420, 422 (9th Cir.1995) (citation omitted)). And to be sure, speech that is "inappropriate or controversial" can address a matter of public concern because "'debate on public issues should be uninhibited, robust, and wide-open.'" *Rankin v. McPherson*, 483 U.S. 378, 387 (1987) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Ultimately, courts determine whether an employee's speech touches on an issue of public concern by evaluating its "content, form, and context." *Coszalter v. City of Salem*, 320 F.3d 968, 973–74 (9th Cir. 2003) (quoting *Allen v. Scribner*, 812 F.2d 426, 430–36 (9th Cir. 1987) (cleaned up)). "In considering content, form, and context, no factor is dispositive, and it is necessary to evaluate all the circumstances of the speech, including what was said, where it was said, and how it was said." *Snyder v. Phelps*, 562 U.S. 443, 454 (2011). Major Worley's speech demonstrates its public nature by form, content, and context.

Here, Major Worley's speech—his opposition to Drag Queen Story Hours, explicit library materials accessible to minors, and moral decay in his community—clearly involves matters of public concern. The *content* of his statements targeted policy issues involving children's welfare, public library operations, and cultural trends. (V. Compl. ¶¶2–3, 78) These opinions are not personal grievances but topics of general interest and of value and concern to the public. *Cf. Hernandez*, 43 F.4th at 978 (holding that police officer's off-duty social media post qualified as

speech on matter of public concern). Indeed, while Defendants (or the Complaining Guardsman) may not have liked Major Worley's comments, "the issues they highlight—the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality . . . are matters of public import." *Snyder*, 562 U.S. at 454.

The *form* of Major Worley's speech further demonstrates its public significance. His remarks were made during his campaign for mayor, a platform designed to engage the public on matters of civic importance. (V. Compl. ¶¶2–3, 65.) Even the Investigating Officer made plain that it was Major Worley's "publicly documented political activities" that was "concerning." (V. Compl. ¶76.) "Courts have consistently ruled that political speech is 'entitled to the fullest possible measure of constitutional protection.'" *Dodge v. Evergreen Sch. Dist.*, 513 F. Supp. 3d 1286, 1295 (W.D. Wash. 2021); *see also Watters v. Otter*, 981 F. Supp. 2d 912, 920 (D. Idaho 2013) ("Political speech is core First Amendment speech, critical to the functioning of our democratic system." (citing *Carey v. Brown,* 447 U.S. 455, 467 (1980)).

Finally, the *context* of Major Worley's statements makes their public nature even clearer. His speech occurred *before* he assumed command of the Recruiting and Retention Battalion, entirely outside his military duties, and in his private capacity as a candidate for public office. (V. Compl. ¶¶2–3, 16, 78.) It was directed to the Pocatello community and broader public in an effort to win a political election—not to military personnel or operations. *Cf. Hernandez*, 43 F.4th at 978 ("Hernandez posted each of the items at issue on his own time, outside the workplace, using his personal Facebook profile."). Major Worley's speech was on matters of public concern.

To be clear, it makes no difference if Defendants perceived that Major Worley's prior posts "expressed hostility toward, and sought to denigrate or mock," persons based on their lifestyle choices. *Hernandez*, 43 F.4th at 978. "The inappropriate or controversial character of a statement

is irrelevant to the question whether it deals with a matter of public concern." *Rankin*, 483 U.S. at 387. Indeed, the Supreme Court "has held that even overtly hateful speech denigrating gay men as a means of protesting the United States' tolerance of 'homosexuality in the military' qualified as speech on a matter of public concern." *Hernandez*, 43 F.4th at 978 (citing *Snyder*, 562 U.S. at 454–55). In short, Major Worley's posts constitute speech on matters to public concern.

>    **2.    Defendants' investigation, suspension, and recommended separation were substantially motivated by Major Worley's protected speech.**

The causal link between Major Worley's protected speech and Defendants' adverse actions is irrefutable. To satisfy this prong, a plaintiff may show causation through three types of evidence: (1) proximity in time between the speech and adverse action; (2) the employer's expressed opposition to the speech; or (3) pretextual justifications for the adverse action. *See Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751 (9th Cir. 2001). All are present here.

*First*, the timing is suspiciously close. Major Worley first day of work was July 5, 2023, he met the Complaining Guardsman on July 7, and the EO Complaint was filed **six days later** on July 13. (V. Compl., ¶¶57-61.) Five days later, Major Worley's command ordered him to a hearing and demanded he voluntarily resign or face significant investigations and punishment. (V. Compl., ¶68.) "[A] Plaintiff can show such a close proximity between the adverse employment action and the protected speech as to create an inference of retaliation." *Wright*, 307 F. Supp. 2d at 1072. *See Coszalter*, 320 F.3d at 977 (noting that even three to eight months is "easily within the time range that can support an inference of retaliation"). In short, the temporal proximity between the EO Complaint wherein Major Worley's speech was discovered and the unconstitutional investigation and punishment against Major Worley raises a strong inference of retaliatory intent.

*Second*, the EO Complaint—filed mere days after Major Worley assumed command—explicitly cited his publicly expressed views as the sole basis for the complaint. (V. Compl. ¶¶ 64–

67.) The Investigating Officer's report and the substituted findings by Brigadier General Packwood all express opposition to Major Worley's speech. (V. Compl., ¶¶73-80 (noting the Investigating Officer's repeatedly references Major Worley's "political activities," "statements," and "concerning ideologies" as grounds for recommending his removal); *id.*, ¶¶73-74 (noting the Investigating Officer's comments that Major Worley's religious views "suggests an inability to uphold the values of equality" and that such religious views create a hostile work environment).) Moreover, as the Investigating Officer made plain, his report on the EO Complaint was necessary because of Major Worley's "publicly documented political activities" that—to the Investigating Officer—contained "many" "concerning activities" and ideologies." (V. Compl., ¶76.) And, the Investigating Officer found that Major Worley's religious views on societal issues were "troubling" and required that he be "permanently removed." (V. Compl., ¶¶81-82.) Defendants punished Major Worley *because of* his speech—a direct violation of the First Amendment. *Accord Connick v. Myers*, 461 U.S. 138, 142 (1983) ("[A] state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.").

*Third*, Defendants' proffered justifications are demonstrably pretextual. Brigadier General Packwood found the allegations of discrimination and hostile work environment to be "UNSUBSTANTIATED" (V. Compl., ¶¶83-92; 107-112.) Thus, as to all of the bases that formed the Complaining Guardsman's EO Complaint against Major Worley, Brigadier General Packwood found each claim to be unsubstantiated, which perforce demonstrates that there was no basis to even begin the investigation into Major Worley. (V. Compl., ¶112.) Nevertheless, Worley was removed from command based on vague allegations of "counterproductive leadership"—a rationale unsupported by the any reasonable interpretation of the term as applied to the facts of this case. (V. Compl. ¶¶ 113–119.) Such shifting and unsubstantiated justifications further confirm

retaliatory motive. As the court in *Wright* noted, using an entirely different justification for a final decision than those that caused the initiation of an investigation, demonstrates that such disciplinary actions are pretextual and false. 307 F. Supp. 2d at 1075.

### 3.    Defendants cannot show adequate justification for treating Major Worley differently.

Step four of the *Hernandez* analysis is the *Pickering* balancing test. To sustain its burden under *Pickering*, "the employer must show that 'its own legitimate interests in performing its mission' outweigh the employee's right to speak freely." *Hernandez*, 43 F.4th at 976 (quoting *City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam)). "To ensure an adequate discussion of the competing interests, servicemembers as well as the public in general have a right to voice their views so long as it does not impact on discipline, morale, esprit de corps, and civilian supremacy." *United States v. Brown*, 45 M.J. 389, 396 (C.A.A.F. 1996). Indeed, "First Amendment rights of civilians and members of the armed forces are not necessarily coextensive, but, in speech cases, our national reluctance to inhibit free expression dictates that the connection between the statements or publications involved and their effect on military discipline be closely examined." *United States v. Priest*, 45 C.M.R. 338, 343–44 (1972); *accord United States v. Wilcox*, 66 M.J. 442, 448 (C.A.A.F. 2008) ("In the context of the First Amendment, in order to meet the second element for conduct charged under a 'prejudice of good order and discipline' theory, we have required that the prosecution show a "reasonably direct and palpable" connection between an appellant's statements and the military mission." (citation omitted)).

Here, Defendants cannot satisfy *Pickering*'s demanding standard. Major Worley's speech occurred long before he assumed command, entirely in a civilian context, and there is no evidence—either from the EO Complaint or the Investigating Officer's findings or Brigadier General Packwood's Substituted Findings—of any actual disruption to unit morale, operations, or

mission efficiency. (V. Compl. ¶¶66, 76, 83–90, 107–119) The Investigating Officer's repeated reliance on subjective characterizations of Worley's religious and political beliefs—labeling them "concerning ideologies" or "questionable" (V. Compl. ¶80)—demonstrates that Defendants' actions stemmed not from mission disruption but from Defendants' ideological disagreement, if not outright animus. Such hostility to Major Worley's personal religious and political beliefs—made as a private citizen before assuming command—cannot outweigh his First Amendment rights. *Cf. Wilcox*, 66 M.J. at 448–49 (finding that accused's statements on the Internet wrongfully advocating anti-government and disloyal sentiments and advocating racial intolerance constituted protected speech under the First Amendment, absent evidence that they constituted dangerous speech that interfered with or prevented the orderly accomplishment of the mission or presented a clear danger to loyalty, discipline, mission, or morale of the troops).

Defendants' vague invocation of "counterproductive leadership" (V. Compl. ¶¶91–92) likewise fails under *Pickering*. As the Ninth Circuit has held, "promoting workplace efficiency and avoiding disruption" may justify speech restrictions only where the government proves speech "impairs discipline by superiors," "impedes the performance of the speaker's duties," or "interferes with regular operation of the enterprise." *Dodge*, 56 F.4th at 781–782. None of these elements is present here. Instead, the record reflects a baseless EO Complaint by a subordinate who was triggered by his commanding officer's past private opinions, unsubstantiated findings, and pretextual disciplinary proceedings driven by discomfort with Major Worley's religious and political viewpoints. Accord *id.* at 782 ("Speech that outrages or upsets co-workers without evidence of 'any actual injury' to school operations does not constitute a disruption." (citing *Settlegoode v. Portland Pub. Schs.*, 371 F.3d 503, 514 (9th Cir. 2004)). Accordingly, Defendants have failed to demonstrate any legitimate justification for treating Major Worley differently. Their

reliance on a disgruntled subordinate's ideological hostility that resulted in an EO Complaint that entirely lacked evidentiary support and merit and spurious claims of "counterproductive leadership" (V. Compl. ¶113) cannot justify the severe adverse actions taken against him.

### 4. Defendants would not have taken the same actions absent Major Worley's speech.

Defendants cannot show that they would have removed Major Worley from command absent his protected speech. The Investigating Officer's report and General Packwood's findings make clear that Worley's speech was the central focus of the investigation and subsequent actions (V. Compl. ¶¶ 68–92, 107–119). No independent evidence exists to support Defendants' actions.

\* \* \*

Major Worley's removal from command and pending separation constitute clear violations of his First Amendment rights. Under the Ninth Circuit's *Hernandez* framework, his speech addressed matters of public concern, was made as a private citizen, and was a substantial factor in the adverse actions taken against him. Defendants cannot justify their retaliation under any permissible standard. Major Worley is likely to succeed on his First Amendment retaliation claim.

### D. Major Worley is likely to succeed on the merits of his claim that the No Christians in Command Policy is unconstitutional viewpoint discrimination.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995); *Good News Club v. Milford Cent. Sch. Dist.*, 533 U.S. 98, 106 (2001) ("The restriction must not discriminate against speech on the basis of viewpoint."). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829. In fact, viewpoint-based regulations are always unconstitutional. *See, e.g.*, *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) ("'the First Amendment forbids the government to regulate speech

in ways that favor some viewpoints or ideas at the expense of others'" (quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984))).

Here, Defendants' No Christians in Command Policy is plainly viewpoint based and prohibits individuals from assuming command in the Idaho Army National Guard solely on the basis of their viewpoint. (V. Compl., ¶¶93-106.) Defendants' No Christians in Command Policy is aimed solely at scrutinizing and ensuring that no one with "concerning ideologies" is able to assume command. (V. Compl., ¶100.) Defendants' policy likewise seeks to preclude individuals with religious beliefs, views, expression, or exercise from slipping past their blatant censorship regime of "scrutinizing" "information in the public domain" to ensure there is no one in command who should be reported for alleged "extremist activity." (V. Compl., ¶98.) The unquestioned import of Defendants' No Christians in Command Policy is that those with religious views, concerning ideologies, or those who may not serve what Defendants consider "persons of diverse backgrounds" are unwelcome in the Idaho Army National Guard command structure, and will be separated from the ranks should Defendants find out about their private speech about religious topics. The First Amendment prohibits this blatant exercise of viewpoint discrimination and its unconstitutional and unconscionable aim of removing all religious adherents from command.

## II.    MAJOR WORLEY HAS SUFFERED, IS SUFFERING AND WILL CONTINUE TO SUFFER IRREPARABLE INJURY ABSENT INJUNCTIVE RELIEF.

"A colorable First Amendment claim is irreparable injury sufficient to merit the grant of relief." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (cleaned up)). This is because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *A.P. v. Otter,* 682 F.3d 821, 826 (9th Cir. 2012) (same). Moreover, "when an alleged constitutional right is involved, most courts hold that no further showing of irreparable

injury is necessary." *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012) (quoting *Kikumara v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001)). The reason for that is simple: "the deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (cleaned up). Major Worley has plainly suffered irreparable injury by being unceremoniously removed from command solely on the basis of his constitutionally protected religious expression and subjected to investigation and threatened with immediate and permanent separation from the full-time force of the Idaho National Guard, effective within thirty days, solely on the basis of his constitutionally protected religious expression. (V. Compl., ¶120-122.) Major Worley could be permanently separated at any moment.

## III.    MAJOR WORLEY SATIFIES THE REMAINING ELEMENTS OF A TRO.

"When, like here, the nonmovant is the government, the last two *Winter* factors merge." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). The reason for that is simple: "We have consistently recognized the 'significant public interest' in upholding free speech principles." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (quoting *Sammartano v. First Jud. Dist. Ct., in & for Cnty. of Carson City*, 303 F.3d 959, 974 (9th Cir. 2002)). *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) ("[T]he public interest favors the exercise of First Amendment rights"). Simply put: "it is always in the public interest to prevent the violation of a party's constitutional rights." *Baird*, 81 F.4th at 1040 (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022)). Because Major Worley has shown a likelihood of success on the merits and irreparable harm from Defendants' First Amendment and FERPA violations, "the balance of the equities and the public interest thus tip sharply in favor of enjoining" Defendants' unconstitutional and unlawful No Christians in Command Policy. *Klein*, 584 F.3d at 1208

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should issue the TRO immediately.


Respectfully submitted,

/s/ Stephen F. Smith
Stephen F. Smith
steve@smithmcowenlaw.com
Idaho Bar 2165
Smith & McOwen, Attorneys at Law
102 Superior Street
Sandpoint, ID 83864
Phone: (208) 263-3115

/s/ Daniel J. Schmid
Mathew D. Staver
Florida 0701092
court@lc.org
Horatio G. Mihet
Florida 026581
hmihet@lc.org
Daniel J. Schmid
Virginia 84415
dschmid@lc.org
Richard L. Mast
Virginia 80660
rmast@lc.org
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Facsimile: (407) 875-0770
*Attorneys for Plaintiff*